**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CLIFTON M. DIXON** and **JUSTUS4US THE**
**POOR PEOPLE'S CAMPAIGN, INC.,**

                    **Plaintiffs,**             **1:08-cv-502**
                                             **(GLS/DRH)**

        **v.**

**ALBANY COUNTY BOARD OF**
**ELECTIONS; VIRGINIA MAFFIA TOBLER;**
**ALBANY COUNTY DEMOCRATIC**
**COMMITTEE; COUNTY OF ALBANY;**
**JAQUELINE E. JONES; WANDA F.**
**WILLINGHAM; JAMES FREZZELL;**
**STEPHANIE GALKA; MATTHEW GALKA;**
and **MATTHEW CLYNE,**

                    **Defendants.**
_____

**APPEARANCES:**              **OF COUNSEL:**

**FOR THE PLAINTIFFS:**

Clifton M. Dixon
Pro Se
P.O. Box 9053
Albany, NY 12209

*Justus 4 Us the Poor People's*
*Campaign, Inc.*
Office of Samuel N. Iroegbu        SAMUEL N. IROEGBU, ESQ.
1531 Central Avenue, Suite 206
Albany, NY 12205

**FOR THE DEFENDANTS:**

*Albany County Board of Elections,*
*County of Albany, James Frezzell,*
*Stephanie Galka, Matthew Galka,*
*and Matthew Clyne*
Napierski, Vandenburgh Law Firm THOMAS J. O'CONNOR, ESQ.
296 Washington Avenue Extension    ASA S. NEFF, ESQ.
Albany, NY 12203

*Virginia Maffia Tobler*
Office of William J. Conboy, II, Esq.    WILLIAM J. CONBOY, II, ESQ.
112 State Street, Suite 1000
Albany, NY 12207

*Albany County Democratic*
*Committee*
Crane, Parente Law Firm    CLEMENTE J. PARENTE, ESQ.
90 State Street, Suite 1515
Albany, NY 12207

*Jacqueline E. Jones*
Feeney, Centi Law Firm    L. MICHAEL MACKEY, ESQ.
116 Great Oaks Boulevard
Albany, NY 12203

*Wanda F. Willingham*
DerOhannesian Law Firm    PAUL DEROHANNESIAN,II,
677 Broadway, Suite 202    ESQ.
Albany, NY 12207

**Gary L. Sharpe**
**District Court Judge**

2

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Pro se plaintiff Clifton M. Dixon and plaintiff Justus4us the Poor People's Campaign, Inc., commenced this action against defendants under 42 U.S.C. §§ 1973, 1983, and 1985, alleging constitutional violations in connection with Dixon's 2007 candidacy for Albany County Legislator for the Fourth Judicial District. (*See* Compl., Dkt. No. 1.) Pending are defendants' motions for summary judgment. (Dkt. Nos. 120, 121, 122, 123 and 131) For the reasons that follow, the motions are granted.

### II. Background

**A.    Factual History**

In 2007, pro se plaintiff Clifton M. Dixon wished to become a candidate for the office of Albany County Legislator of the Fourth Judicial District. (*See* County Defs. SMF ¶ 1, Dkt. No. 120:14.) To that end, Dixon sought the endorsement of the Albany County Democratic Committee. (*Id.* at ¶ 12.) On May 12, Dixon met with Frank Commisso, Co-Chair of the Committee, to discuss his intention to become a candidate. (*See* Compl. ¶ 42, Dkt. No. 1.) According to Dixon, this meeting was arranged by defendant Wanda F. Willingham, Legislator for Albany

County's Third Legislative District.  (*See id.*; Willingham SMF ¶ 1, Dkt. No.
123:3.)  During their meeting, Dixon claims that Mr. Commisso advised him
that the incumbent, defendant Virginia Tobler, was running for re-election,
and "suggested that [Dixon] see the nomination process through to Party
endorsement and, if unsuccessful, show 'Democratic Party unity' by not
pursuing it any further to a Primary."  (Compl. ¶ 43, Dkt. No. 1.)  According
to Dixon, Mr. Commisso further "suggested that in the case ... Dixon was
unsuccessful at securing the Party endorsement, that [he] should actively
support the incumbent (Virginia Mafia Tobler)."  (*Id.* at ¶ 44.)

On May 15, the Committee held a meeting for the purpose of
determining which candidate it would endorse.  (*See* County Defs. SMF ¶
3, Dkt. No. 120:14.)  Dixon attended the meeting and was interviewed and
considered for nomination.  (*See* Compl. ¶¶ 46-54, Dkt. No. 1.)  Ultimately,
however, the Committee decided to endorse Tobler, the incumbent, and
not Dixon, as its candidate for the Fourth Judicial District.  (*See id.* at ¶ 54;
County Defs. SMF ¶ 3, Dkt. No. 120:14.)

In his complaint, Dixon appears to challenge the processes by which
this meeting was conducted.  Specifically, Dixon claims that neither he nor
"representatives of heavily minority populated districts" received any formal

4

notice of or invitation to the meeting, and that he only learned of the meeting "by chance that afternoon." (Compl. ¶¶ 46-49, Dkt. No. 1.) According to Dixon, while at the meeting, "he objected to the process whereby the meeting was called and expressed a concern that the representatives of heavily minority populated districts had been disenfranchised to participate[]." (*Id.* at ¶ 49.) Despite Dixon's objections, the meeting proceeded. (*See id.* at ¶ 51.) As a result, Dixon claims "he was forced to be interviewed or risk missing the opportunity because they would not adjourn the meeting to ensure proper notification." (*Id.* at ¶ 52.) Dixon further states that because he had learned of the meeting only a few hours prior, he was not "properly attired, shaven or prepared with any documentation to support [his] claims of eligibility for candidacy." (*Id.*) Based on these allegations, Dixon claims that the committee members who were not present because of improper notification were "disenfranchised from voting and representing their constituents' 'weighted vote,'" and that this disenfranchisement was the product of a "deliberate scheme" by defendants Tobler and Willingham, Frank Commisso, and other Albany County Democratic Party Members "to dilute the voting strength of minority voters to ensure the endorsement for the incumbent." (*Id.* at ¶¶ 46, 51.)

A few days later, Dixon contacted defendant Matthew J. Clyne, Democratic Commissioner of the Albany County Board of Elections, "to complain about the process." (*See id.* at ¶ 56.)  According to Dixon, Clyne told him that "there was nothing Dixon could do and 'it didn't mean anything' and that the process wasn't actionable in court because the State Supreme Court doesn't had no [sic] jurisdiction over political Party procedure and [Dixon] just had to circulate a petition if [he] wanted to run." (*Id.*)  Dixon followed Clyne's advice, circulated a designating petition, and ultimately collected enough signatures to be placed on the primary election ballot for the Democratic and Independent Parties.  (*See id.* at ¶¶ 4, 57.) Dixon claims that while he decided to follow Clyne's advice "based on his credibility as the Democratic Commissioner, an attorney, and an experienced campaigner," he "did not realize at the time that [Clyne] was also ... 2nd Vice Chair of the Albany County Democratic Party's Executive Committee, and [that his] advice may have been motivated to mislead Dixon in order to protect the ... Committee and a scheme to [d]eny Dixon the right to commence an Article 78 proceeding."  (*Id.*)

Like Dixon, defendants Tobler and Jacqueline Jones filed with the Board designating petitions containing the requisite number of signatures

to appear on the primary ballot for the Democratic Party.  (*See id.* at ¶ 5.)

With respect to Jones's petition, Dixon claims, without explanation, that the

signatures it contained were "fraudulently procured," and that the Board

"unlawfully changed the voter status of the signatories [in the  petition] to

approve invalid signatures to ensure her position on the ballot."  (*Id.* at  ¶

65.)

On July 30, shortly after Tobler and Jones filed their petitions, Dixon

again contacted Clyne, this time to "personally apprise him of the

fraudulent procurement of signatures by ... Jones."  (*Id.* at ¶ 67.)

In response to Dixon's allegations, Clyne told Dixon that he would have to

file a Special Proceeding in New York State Supreme Court because,

according to Dixon, "he didn't feel comfortable throwing out the Petition ...,

[and] that a judge should do it."  (*Id.* at ¶ 68 (internal quotation marks

omitted).)  Not satisfied with this response, Dixon approached another

Board Commissioner, John Graziano, but Graziano also refused to conduct

a substantive investigation into Dixon's complaints.  (*See id.* at ¶ 69.)

Ultimately, on August 2, Dixon commenced an Article 78 proceeding

in New York State Supreme Court against Clyne and Graziano, as

constituting the Albany Board of Elections, and Jones and Tobler, as

7

Democratic candidates in the Fourth Legislative District, apparently

challenging Jones and Tobler's designating petitions.  (*See* County Defs.

SMF ¶ 7, Dkt. No. 120:14; Aug. 2, 2007 Order to Show Cause (OTSC),

Dkt. No. 120:2.)  However, because the proceeding was not commenced

within the time prescribed under § 16-102 of the New York Election Law,

Dixon's Petition was dismissed.  (*See* Defs. SMF ¶ 8, Dkt. No. 120:14;

State Dismissal Order at 2, Dkt. No. 120:3.)

On September 18, the primary election was held, and Dixon was not

nominated as candidate for either the Democratic or Independent Party.

(*See id.* at ¶ 10, Dkt. No. 120:14.)  Instead, Tobler received the most votes

for the Democratic party, and Jose Lopez—apparently a member of

Dixon's campaign committee—secured the majority of votes for the

Independent nomination.  (*See id.* at ¶¶ 59, 130, 131.)

On September 24, Dixon filed a second Article 78 proceeding in New

York State Supreme Court against the same individuals.  (*See* Defs. SMF ¶

12, Dkt. No. 120:14.)  In his Petition, Dixon challenged the outcome of the

election, alleging that the "election proceedings were illegal and invalid"

because of various irregularities.[1]  (*See* Sept. 24, 2007 Art. 78 Pet., Dkt. No. 120:8.)  Based on these same allegations, Dixon commenced a third Article 78 proceeding on September 26.  (*Id.* at ¶ 121; Sept. 26, 2007 Art. 78 OTSC, Dkt. No. 120:9.)  The relief sought in his September 26 filing included a preliminary injunction and an order directing the Board to re-canvass all votes, inspect voting machines before a re-canvass, and designate Dixon the candidate for the primary election.  (*See* Sept. 26, 2007 Art. 78 OTSC, Dkt. No. 120:9.)

A consolidated evidentiary hearing on Dixon's Sept 24 and 26 filings was held on October 23, 2007, before New York State Supreme Court Justice Thomas J. McNamara.  (*See* Compl. ¶ 125, Dkt. No. 1.)  During the

---

[1]Specifically, Dixon alleged that: (1) several polling locations contained fewer poll inspectors than are required under New York State Election Law; (2) several polling locations were opened without bipartisan representation; (3) poll inspectors at several polling locations were not properly trained and certified pursuant to the Election Law; (4) polling inspectors at several polling locations failed to properly elect a chairperson pursuant to the Election Law; (5) poll inspectors at several polling locations did not act as a Board in rendering decisions as required under the Election Law; (6) the Board of Elections filled several poll inspector vacancies using procedures that did not comply with the Election Law; (7) several affidavit ballots were cast by duly registered voters but were not delivered to be counted by the Board of Elections; (8) the Board of Elections did not provide an accurate list of challenges of voter registrations; (9) at least one unauthorized person was permitted in a poll inspectors area and was allowed unrestricted access to poll books and official documents for extended periods of time; (10) several affidavit ballots did not contain a listed party affiliation; (11) the seal on one voting machine was altered and/or poll records contained inaccurate information; (12) at least one individual was entered into the wrong registration record book and was thus permitted to vote in the wrong primary election; and (13) many absentee ballots were not issued in accordance with the Election Law.  (*See* Sept. 24, 2007 Art. 78 Pet. at 6(a)-(m), Dkt. No. 120:8.)

hearing, Dixon presented evidence in support of his allegations of election misconduct, including evidence purporting to show that: (1) a voter was allowed to cast a vote in a primary election for a party to which he was not enrolled; (2) poll locations were opened without bipartisan representation as required under New York's Election Law; (3) a voter was directed to fill out an affidavit ballot rather than being directed to a proper polling location; (4) outer envelopes of absentee ballots were not properly preserved; (5) a voting machine malfunctioned resulting in an Independent Party voter voting in the Democratic Party line; (6) affidavit ballots were missing following the election and found prior to canvassing; and (7) polling officials were not properly trained and were not familiar with New York State Election Law.  (*See* Defs. SMF ¶ 14, Dkt. No. 120:14.)

On October 23 and 24, Justice McNamara issued written orders dismissing Dixon's Petitions.  (*See id.* at ¶¶ 15, 17.)  In his Orders, Justice McNamara found that Dixon failed to make a prima facie showing that the claimed irregularities, if proven, would have affected the outcome of either the Democratic or Independent primary elections, ruling that such failure required dismissal of Dixon's Petitions.  (*See id.*)  Justice McNamara further ordered that the Board certify Tobler as the winner of the

Democratic primary and Jose Lopez as the winner of the Independent

primary.  (*See id.* at ¶¶ 16, 18.)  Dixon did not appeal either of Justice

McNamara's Orders.  (*See id.* ¶ 19.)

## B.    **Procedural History**

On May 12, 2008, Dixon, Justus4us,[2] and other plaintiffs[3]

commenced the current action under 42 U.S.C. §§ 1973, 1983, and 1985,

alleging that defendants violated their rights under the Voting Rights Act of

1965 and the Equal Protection Due Process Clauses of the Fourteenth

Amendment, conspired to violate these rights, and violated certain of his

"contract rights" in connection with the events surrounding the September

2007 election.  (*See* Compl. ¶ 1, Dkt. No. 1.)  In addition to asserting these

claims against the Board, the Committee, Clyne, Tobler, Jones, and

Willingham, plaintiffs have also named as defendants James Frezzell,

---

[2]According to the complaint, "Justus4us the Poor People's Campaign, Inc. ... is a charitable organization pursuant to the Laws of New York State that represents the interests of Blacks, Latinos, Lesbians, Gays, Bi-Sexuals, Transgenders, and those who are impoverished in Albany County in Legal, Healthcare, Electoral, Education and Employment matters, and encourages its members to register to vote and participate in the electoral process." (Compl. ¶ 4, Dkt. No. 1.)  The complaint further states that "Justus4us is aggrieved by Defendants' actions because they significantly impeded [its] ability to effectively fulfill its institutional purpose of advancing Albany County voters' full and meaningful participation in the electoral process." (*Id.*)

[3]While Louis M. Brown, Frances Poole, and Cleo B. Carter were originally plaintiffs in this action, this court granted defendants' motion for sanctions against them on March 23, 2010, and dismissed the complaint as to them for failure to appear for court-ordered depositions.  (*See* Dkt. No. 115.)

Stephanie Galka, and Matthew Galka, each of whom worked as poll

inspectors at a certain polling site during the September 2007 primary

election.  (*See id.* at ¶¶ 16-18.)  Defendants now seek summary judgment

on all of plaintiffs' claims.  (Dkt. Nos. 120, 121, 122, 123.)

### III.  <u>Standard of Review</u>

The standard for the grant of summary judgment is well established

and will not be repeated here.  For a full discussion of the standard, the

court refers the parties to its previous opinion in *Bain v. Town of Argyle*,

499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).  As relevant to the current

motion, "courts must construe pro se pleadings broadly, and interpret them

to raise the strongest arguments that they suggest," especially where civil

rights violations are alleged.  *See Cruz v. Gomez*, 202 F.3d 593, 597 (2d

Cir. 2000) (internal quotation marks, citations, and italics omitted).

### IV.  <u>Discussion</u>

Stated generously, plaintiffs' complaint lacks clarity.  In it, plaintiffs fail

to identify which claims are being asserted against which defendants, offer

no meaningful explanation as to the precise grounds for each of their

claims, and plead a somewhat ambiguous request for relief.  To the extent

12

that specific allegations are asserted in plaintiffs' voluminous and disjointed pleading, they largely mirror the allegations made in Dixon's prior Article 78 proceedings relating to the claimed "irregularities" surrounding the September 2007 election.  As outlined above, these irregularities include the appointment of inexperienced and untrained poll workers; opening poll sites without bipartisan representation; allowing a parolee to act as a poll inspector; furnishing improper poll books to inspectors; destroying postmarked envelopes of absentee ballots; and failing to account for all affidavit ballots.  (*See* Compl. ¶¶ 92, 95, 105, 109, 112-16, Dkt. No. 1.)  It appears that in plaintiffs' view, these irregularities and all acts taken by defendants were aimed at and resulted in diluting minority voting strength so as to prevent Dixon from being elected Legislator for the Fourth Judicial District.  Construed liberally, each of plaintiffs' claims flow from this general premise, and for the reasons that follow, each of plaintiffs' claims must fail.[4]

## A.     Equal Protection

---

[4]While the court has serious doubts that the *Rooker-Feldman* doctrine does not operate to bar plaintiffs' claims in light of the prior Article 78 proceedings, plaintiffs' inartful pleading and generalized requests for relief render any cogent analysis and definitive ruling in that regard near impossible.  Accordingly, the court will turn to an examination of plaintiffs' claims on the merits.

"[A] § 1983 action invoking the Equal Protection Clause is not

available to remedy election process errors in the absence of a showing of

'intentional or purposeful discrimination.'" *Gelb v. Bd. of Elections*, 224

F.3d 149, 154 (2d Cir. 2000) (citation omitted); *see also Donahue v. Bd. of

Elections*, 435 F. Supp. 957, 966 (W.D.N.Y. 1976) (explaining that

"[p]urposeful deprivation of the right to vote will not be assumed merely

because there is evidence that election officials acted incompetently or

negligently").  Here, as noted above, Dixon claims his equal protection

rights were violated because defendants' acts and omissions were aimed

at and resulted in diminishing minority voting strength to prevent Dixon's

election on the basis of race.  As defendants correctly observe, however,

plaintiffs have failed to allege any facts or offer any evidence from which

even an inference of intentional or purposeful race-based discrimination

could be drawn.  Rather, in response to defendants' motions, plaintiffs rely

wholly on their complaint and conclusory, unsupported assertions of race-

based discrimination.  Such reliance is insufficient to survive summary

judgment on this claim.  *See, e.g.*, *Gilmore v. Amityville Union Free Sch.

Dist.*, 305 F. Supp. 2d 271, 277-78 (E.D.N.Y. 2004) (finding that equal

protection claim based on alleged race-based discrepancies in vote tallying

could not survive where plaintiffs alleged only "conclusory claims of discriminatory intent" and no facts from which "any discriminatory intent ... [could] be reasonably inferred").  Further, and even more fundamentally, plaintiffs have failed to allege that discrimination of any sort, purposeful or otherwise, actually occurred.  Indeed, the record is devoid of any indication that any of the defendants' conduct or the claimed irregularities surrounding the election had any impact on the outcome of the election, much less an impact proceeding along racial lines.  Accordingly, in the absence of any facts or evidence suggesting that Dixon was purposefully or intentionally discriminated against on the basis of race, plaintiffs' equal protection claims are dismissed.

**B.**   **Due Process**

Plaintiffs' due process claims also fail.  As in the equal protection context, "more than negligent conduct by [a] state actor is needed [to establish] a ... § 1983 claim ...  based on violations of the due process clause."  *Shannon v. Jacobowitz*, 394 F.3d 90, 95 (2d Cir. 2005) (citation and internal quotation marks omitted).  Indeed, "plaintiffs who can establish nothing more than 'unintended irregularities' in the conduct of elections are barred from obtaining § 1983 relief in federal court."  *Id.* (citation and

15

internal quotation marks omitted); *see also id.* at 96 ("In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election.") (citation and internal quotation marks omitted).  In this case, Dixon  relies on the alleged irregularities surrounding the September 2007 election to demonstrate that his due process rights were violated, but points to no facts or evidence to suggest that such irregularities were anything more than the "garden variety" type.  Indeed, there are no facts or evidence from which a reasonable inference could be drawn that any of the defendants' acts or omissions were carried out with the intent to deprive Dixon of his right to participate in the September 2007 election or otherwise impair any citizen's right to vote.  For that reason, plaintiffs' due process claims are dismissed.

**C.    Voting Rights Act**

Plaintiffs' complaint states that their action arises, in part, "under 42 U.S.C. § ... 1973," which is also known as the Voting Rights Act of 1965 (VRA).  (*See* Compl. ¶ 2, Dkt. No. 1.)  Other than this introductory reference, the remainder of plaintiffs' fifty-seven page complaint makes no mention of the VRA, and fails to clearly indicate in any way how plaintiffs

allege that it was violated.  Thus, it is unclear as to whether plaintiffs are actually attempting to assert a claim under the VRA.  However, to the extent that such a claim is intended, it is dismissed.  The VRA constitutes a "comprehensive scheme to eliminate racial discrimination in the conduct of public elections." *Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970).  In this case, plaintiffs have made no showing that any defendant's acts or omissions, including the claimed irregularities surrounding the election, had any discriminatory impact, racial or otherwise, on any aspect of the election.  Absent that threshold showing, the court fails to discern any basis upon which any claim under the VRA could be maintained.

And to the extent that plaintiffs may be alleging that defendants' violated the VRA by "intimidating, threatening, or coercing" voters, (*see* Compl. ¶ 46, Dkt. No. 1; *see also* 42 U.S.C. § 1973i(b)[5]), or attempting to do so, that allegation is insufficient as the record is devoid of any facts or evidence from which even a reasonable inference of the existence of such conduct could be drawn.  Accordingly, to the extent plaintiffs are attempting to assert claims under the VRA, those claims are dismissed.

--------

[5]Section 1973i(b) provides, in relevant part, that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote."  42 U.S.C. § 1973i(b).

## D.   **Breach of Contract**

Confusingly, Dixon also alleges that his "contract rights" were violated in connection with the September 2007 election. (*See* Compl. ¶¶ 165-75, Dkt. No. 1.) In support of this claim, the complaint points to the Contracts Clause of the United States Constitution, (*see id.* at ¶ 169 (citing U.S. CONST. art. I, § 10)), and alleges the following:

> 171. The execution of a Voter Registration Card is the execution of the contract between the State, County of Albany, Board of Elections and those participating as voters.

> 172. The Voter Registration contract contains not only the Right to cast a vote, but the corollary Right to have votes counted accurately.

> 173. Plaintiff registered voters in no way, would wilfully consent to this contract if they even suspected the votes could be compromised or the vote counting process was ripe for fraud of machine failure or even sabotage.

> 174. Indeed, lacking the integrity of an open, verifiable, transparent election including the counting of all cast machine and written ballots that are tabulated with a documented "People's chain of custody," Defendants' voting procedures have the appearance of a rigged gambling table, sham election or game show where the "house" determines who wins. Unfortunately for the Plaintiffs, and the balance of America, the outcome of this particular electoral event poses a very real threat affecting the choices of voters in Albany County's 4th Legislative District and potentially altering the future of the County itself.

> 175. That Defendants have lent their imprimatur and

assistance to this contract fraud and is indefensible and
unconstitutional.

(*Id.* at ¶ 172-75.)

As an initial matter, plaintiffs' reliance on the Contract Clause to

supply a legal basis for their "breach of contract" claim is misplaced.

Liberally construed, plaintiffs' contract claim alleges that the Board violated

its contractual obligation to receive votes properly and count them

accurately.  Plaintiffs do not allege that a state law has retroactively

impaired Dixon's contractual rights.  Thus, the Contracts Clause is

inapplicable here.  *See* U.S. CONST. art. 1, § 10, cl. 1 (providing that [n]o

State shall ... pass any ... Law impairing the Obligation of Contracts");

*CFCU Cmty. Credit Union v. Hayward*, 552 F.3d 253, 267 (2d Cir. 2009)

("The first step in Contract Clause analysis asks whether the state law has,

in fact, operated as a substantial impairment of a contractual relationship."

(citation and internal quotation marks omitted)).

Moreover, even construing plaintiffs' claim as one for common law

breach of contract, the claim would nonetheless fail as the court discerns

no legal or factual basis for concluding that any legally enforceable

contractual relationship existed between Dixon and the Board.  *See E.*

*Coast Resources, LLC v. Town of Hempstead*, 707 F. Supp. 2d 401, 409

(E.D.N.Y. 2010) ("A prerequisite to recovering [for breach of contract] is the existence of a valid contract." (citations omitted)).  Accordingly, plaintiffs' "breach of contract" claim is dismissed.

## E.    Conspiracy and *Monell* Claims

Finally, plaintiffs allege not only that defendants violated Dixon's constitutional rights in the ways discussed above, but also that defendants engaged in a conspiracy to do so.  However, because the substantive constitutional claims underlying that alleged conspiracy are fatally deficient, plaintiffs have no basis upon which to maintain their conspiracy claims. *Mitchell v. Cnty. of Nassau*, No. CV 05–4957, 2011 WL 1113767, at *16 (E.D.N.Y. 2011) ("[A] § 1983 conspiracy claim fails as a matter of law where there is no underlying constitutional violation." (citing, inter alia, *Curley v. Vill. of Suffern,* 268 F.3d 65, 72 (2d Cir. 2001)).  Accordingly, those claims are dismissed.  Similarly, to the extent plaintiffs may be asserting *Monell* claims against the Board for failure to train or supervise poll inspectors, (*see, e.g.*, Compl. ¶¶ 95, 99, 102, Dkt. No. 1), those claims are also dismissed.  *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 132 (2d Cir. 1997) ("[A] claim of inadequate training and supervision under § 1983 cannot be made out against a supervisory body without a finding of a

20

constitutional violation by the persons supervised....").

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motions for summary judgment (Dkt.

Nos. 120, 121, 122, 123 and 131) are **GRANTED**; and it is further

**ORDERED** that plaintiffs' complaint (Dkt. No. 1) is **DISMISSED**; and it

is further

**ORDERED** that the Clerk close this case and provide a copy of this

Memorandum-Decision and Order to the parties by regular and certified

mail.

**IT IS SO ORDERED.**

May 16, 2011
Albany, New York

Gary L. Sharpe
U.S. District Judge

21